IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ANGELA DAWN EVANS,

        Plaintiff,

v.                                                        Civil Action No. 3:09-CV-39

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.  Background

Plaintiff, Angela Evans (Claimant), filed a Complaint on June 15, 2009, seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on August 25, 2009.[2]

Claimant filed his Motion for Judgment on the Pleadings on September 17, 2009.[3]

Commissioner filed his Motion for Summary Judgment on October 16, 2009.[4]

B.  The Pleadings

    1.  Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 10.

[4] Docket No. 11.

1

2.     Defendant's Brief in Support of Motion for Summary Judgment.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision to afford little weight to the opinions of two of the treating sources and to discredit Claimant's testimony as to the intensity, persistence, and limiting effects of the symptoms.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II.  Facts

A.     Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) on August 28, 2006, alleging that she would become disabled at the end of the week on Friday, September 1, 2006, her last day of work, due to bipolar disease, high blood pressure, thoughts of suicide, chronic pain, severe depression, mood swings, aggressive behavior, panic attacks, excessive irritability, rage, anger, inability to concentrate, indecisiveness, and loss of energy. (Tr. 132, 136).  The claim was denied initially on January 22, 2007, and upon reconsideration on May 9, 2007.  (Tr. 76, 81).  Claimant filed a written request for a hearing on May 17, 2007.  (Tr. 84).  Claimant's request was granted and a hearing was held on March 19, 2008.  (Tr. 24-73).

The ALJ issued an unfavorable decision on April 18, 2008.  (Tr. 9-23).  The ALJ determined Claimant was not disabled under the Act because she had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20

C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 404.1560(c) and 404.1566). (Tr. 12-22). On April 23, 2008, Claimant filed a request for review of that determination. (Tr. 5). The request for review was denied by the Appeals Council on April 24, 2009. (Tr. 1). Therefore, on April 24, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.      Personal History

Claimant was born on August 4, 1966, and was forty (40) years old as of the onset date of his alleged disability and forty-one (41) as of the date of the ALJ's decision. (Tr. 132). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant graduated from high school and took some college courses in computer science. (Tr. 32, 145). Claimant is a licensed cosmetologist and has worked 16 years for the Allegheny County government in Maryland. (Tr. 33-40).

C.      Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Office Treatment Records, Dr. Livengood, 5/24/04 - 9/12/06 (Tr. 216-27)**

<u>5/24/04</u>: Prevaced 30 mg
<u>6/10/04</u>: Diflucan 150 mg
<u>7/9/04</u>: Xanax .25 mg
<u>8/9/04</u>: Soma
<u>9/28/04</u>: Soma
<u>1/7/05</u>:
- subjective: high blood pressure; high sugar; anxious; cough
- objective: rhonchi in both lung fields; tenderness over max sinuses; elevated BP; fundi show grade one changes; no edema of the ankles
- plan: placed on Atenolol 25 mg, Zithromax Z-pack, Allegra; refilled Xanax; ordered BW
<u>3/14/05</u>: refilled Soma
<u>6/2/05</u>
- subjective: muscle aches and pains
- objective: muscles are slightly tender in upper back and neck area; lungs are clear; heart is regular
- assessment: taken off Soma 3x/day; use Xanax in evening with Motrin
<u>7/1/05</u>: Soma refill; prevacid
<u>8/2/05</u>: Soma
<u>8/25/05</u>: Xanax
<u>9/15/05</u>
- subjective: thinks she has chronic mono; high BP; thinks she needs Soma 3x/day; headaches
- objective: fundi show grade 1 changes; neck is supple; carotid pulses are good; heart is regular; elevated BP
- assessment: big tendency to overdue her medications; monitor BP and avoid caffeine and salt; Tylenol for headaches
<u>9/20/05</u>
- subjective: BP elevated
- objective: pulses good; lungs clear; heart is regular; BP is elevated
- assessment: monitor BP closely because she does not want medicine
<u>11/10/05</u>: Diflucan
<u>12/13/05</u>: Zithromax Tri-pack
<u>12/20/05</u>: Xanax
<u>1/17/06</u>
- subjective: tired; not sleeping well; anxious; headaches; sinus drainage
- objective: BP is elevated; heart is in mid 80's; nose and throat reveal edema and redness of the mucousa with tenderness over max sinuses; neck is supple with tenderness of neck and upper back; reflexes are equal
- assessment: taking too many different kinds of medicine; takes medicines whenever she thinks she needs them
- plan: stop Soma; increase Xanax; placed on Doxyxycliine, Nasalcrom; stop Afrin; placed on Verapamil
<u>4/11/06</u>
- subjective: cholesterol

- objective: considerable amount of muscle tenderness in upper back and neck area; lungs are clear; heart is regular; no edema of the ankles
- assessment: patient is concerned about her health; insists on having Soma; wants medicine for her cholesterol
- plan: placed on Vytorin; increased Verapamil; placed on Soma with instruction to take as few as necessary

6/19/06: Xanax

6/29/06
- subjective: abdominal pain; high BP; stressed
- objective: lungs are clear; heart is regular; tenderness in right upper quadrant; reflexes are good
- plan: ultrasound of abdomen and pelvis; placed on Cipro and Cymbalta

7/21/06: Precacid

7/31/06: Soma

8/7/06
- subjective: irritable; not had much in the way of thoughts of suicide, but some
- objective: no exam

**Progress Notes, Allegny Internal Medicine, 5/12/06 - 9/18/06 (Tr. 228-42)**

2/15/06
- reason: carotid US: occasional loss of vision in both eyes
- impression: no evidence of luminal stenosis or flow disturbance; no evidence of significant atherosclerotic disease; no evidence of subclavian steal

2/15/06
- reason: MRA brain/ MRI brain: occasional loss of vision in both eyes
- impression: normal MRI exam of cerebral parenchyma; areas of optic radiation, optic chiasm and optic nerves are entirely within normal limits; base of the skull including facial areas are entirely within normal limits; normal MR angiography of head

5/12/06
- problems/complaints: using vytorin - now having muscle aches; stressed at home
- impression: Card: HTM; endocrine: Hyperchol
- plan: lipid panel/C-peptide; counseling; Aldolase

8/3/06
- problems/complaints: "doesn't have nerves left;" panic attacks; depression; "no reason to be here;" tried Cymbalta - not working
- impression: Card: HTN; endocrine: Hyperchol
- plans: counseling; refer to Dr. Holwager; Lexapro

8/21/06
- problems/complaints: seeing Dr. Holwager; "all my life people make me do things I don't want to"
- impression: card: HTN; Neuro: depression
- plan: CMP and Lipds lab tests; counseling; increase Lexapro

9/5/06
- problems/complaints: rage, anger, trouble organizing thoughts

- impression: Card: HTN; endocrine: hyperchol; neuro: bipolar
- plan: counseling

9/18/06
- problems/complaints: worried
- impression: neuro: depression
- plan: counseling

**Office Treatment Records, Robert Lynn, MD, 8/22/06-9/18/06 (Tr. 243-48)**

8/22/06
- presenting problem: rage; panic disorder; illegible
- mental status exam:
  - mood: depressed
  - affect: appropriate
  - hallucinations: auditory
  - thought process: logical
  - speech: normal rate
  - psychomotor: normal
  - behavior: cooperative, pleasant
  - appearance/presentation: looks stated age; neat and groomed
  - energy: down
  - feelings: helplessness, hopelessness, worthlessness, guilt
  - attention/concentration: easily distracted
  - estimate of intelligence as evidenced by general fund of knowledge: average
  - suicidal behavior: ideation; attempt
  - violent/aggressive behavior: yes
- case formulation: bipolar and depression
- diagnosis: Axis I - bipolar mixed

8/31/06
- Seen for meds
- diagnosis: bipolar

9/18/06
- target symptoms: mood - no improvement; anxiety - increased
- side effects: cognition problem
- diagnosis: axis I - bipolar

**Office Treatment Records, Dr. Audie Klinger, DC, Allegany Chiropractic Center, 7/20/06-9/26/06 (Tr. 249-52)**

7/20/06
- complains of upper back, neck, lower back pain, headaches, jaw pain, sinus problems, neck pain, neck stiffness, right/left shoulder, and mid back; sitting, walking, and bending make problems worse
- diagnosis: cervical brachial radiculitis, lumbar disc degeneration, cephalgia, muscle spasm
- treatment: ultrasound; galvanic stimulation; soft tissue massage; trigger point therapy;

manual manipulation of the suboccipital, cervical, thoracic, lumbar, sacral, and both sacroiliac joints; myofascial release over the piriformis, gluteus medius, upper traps, suboccipital area; cervical and lumbar traction

7/21/06
- complaints: doing pretty well; neck, mid back, and lower back have improved; little ringing in right ear; spasms decreased
- treatment: ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic, lumbar, sacral, and both sacroiliac joints; myofascial release over gluteus medius, TFL, upper traps, suboccipital area; intermittent traction

8/18/06
- complaints: some beck and upper back pain; positive cervical distraction right/left and positive maximum cervical rotary compression right/left; upper traps, suboccipital spasm
- treatment: ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic area; myofascial release over the upper traps, suboccipital area; intermittent traction

8/23/06
- complaints: neck, mid back and lower back pain; point tenderness at C3-4-5, T4-5, and L3-4-5; positive cervical distraction right/left; positive Lasegues and Bragards right/left; upper traps, suboccipital, gluteus medius, and TFL spams
- treatment: ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic area; myofascial release over upper traps, suboccipital area; intermittent traction

8/28/06
- complaints: neck, mid back, lower back pain; spasm in upper trap, suboccipital area; positive cervical distraction right/left and positive maximum cervical rotary compression left/right.  ROM is somewhat diminished
- treatment:  ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic area; myofascial release over upper traps, suboccipital area; intermittent traction

9/18/06
- complaints: still having neck and upper back pain and lower back pain; diagnosed bipolar; positive cervical distraction right/left and positive maximum cervical rotary compression right/left; upper traps, suboccipital spams
- treatment:  ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic area; myofascial release over upper traps, suboccipital area; intermittent traction

9/22/06
- complaints: doing little bit better; still has neck, upper back, and lower back pain; point tenderness at C3-4-5, T4-5, and L3-4--5; positive cervical distraction right/left and positive Lasegues and Bragards right/left
- treatment: ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic, lumbar, sacral, and both sacroiliac joints; myofascial release over gluteus medius, TFL, upper traps, suboccipital area; intermittent traction

9/26/06

- complaints: some neck and upper back pain with radiation in arms; positive cervical distraction right/left and positive maximum cervical rotary compression right/left; upper traps, suboccipital spasm
- treatment: ultrasound; galvanic stimulation; manual manipulation of the suboccipital, cervical, thoracic area; myofascial release over upper traps, suboccipital area; intermittent traction

**Mental RFC Assessment, Melissa Robinson, DO, 10/30/06 (Tr. 253-57)**
- DSM-IV Multiaxial Evaluation:
  - Axis I: bipolar type I mixed
  - Axis II: none
  - Axis III: hypertension
  - Axis IV: moderate
  - Axis V: Current GAF: 55
  - Highest GAF past year: 60
- clinical findings: agitation, anger, impulsity, poor concentration, impaired short-term memory, suicidal ideation, mood instability
- prognosis: guarded to poor
- signs/symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight changes; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or affect; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes; motor tension; emotional liability; manic syndrome; easy distractability; autonomic hyperactivity; memory impairment - short-term; sleep disturbance
- mental abilities and aptitudes needed to do unskilled work:
  - remember work-like procedures: unable to meet competitive standards
  - understand/remember short and simple instructions: unable to meet competitive standards
  - carry out short/simple instructions: unable to meet competitive standards
  - maintain attention for 2-hour segment: unable to meet competitive standards
  - maintain regular attendance and be punctual: unable to meet competitive standards
  - sustain ordinary routine without special supervision: unable to meet competitive standards
  - work in coordination with or proximity to others without being unduly distracted: no useful ability to function
  - make simple work-related decisions: unable to meet competitive standards
  - complete normal workday and workweek without interruptions from psychologically based symptoms: no useful ability to function
  - perform at a consistent pace without an unreasonable number and length of rest periods: no useful ability to function

- ask simple questions or request assistance: seriously limited, but not precluded
- accept instructions and respond appropriately to criticism from supervisors: unable to meet competitive standards
- get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes: no useful ability to function
- respond appropriately to changes in a routine work setting: no useful ability to function
- deal with normal work stress: no useful ability to function
- be aware of normal hazards and take appropriate precautions: seriously limited, but not precluded
- Mental abilities and aptitudes needed to do semiskilled and skilled work
  - understand and remember detailed instructions: no useful ability to function
  - carry out detailed instructions: no useful ability to function
  - set realistic goals or make plans independently of others: no useful ability to function
  - deal with stress or semiskilled work: no useful ability to function
- mental abilities and aptitude needed to do particular types of jobs
  - interact appropriately with general public: no useful ability to function
  - maintain socially appropriate behavior: no useful ability to function
  - adhere to basic standards of neatness and cleanliness: seriously limited, but not precluded
  - travel in unfamiliar place: no useful ability to function
  - use public transportation: seriously limited, but not precluded

**Medical Evaluation Case Analysis, Dolph Druckman, M.D., 11/16/06 (Tr. 258)**
- review of the available MER indicates no medically determinable impairment of a severe nature

**Mental RFC Assessment, Dr. James Holwager, 11/17/06 (Tr. 259-64)**
- DSM-IV Multiaxial Evaluation:
  - Axis I: bipolar type I mixed
  - Axis II: none
- treatment and response: responding to cognitive behavioral therapy
- prognosis: good - adjusting to work; bad - going back to work
- signs/symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight changes; decreased energy; impairment in impulse control; poverty of content of speech; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked stress; persistent disturbances of mood or affect; persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; change in personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive

syndromes; persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; perceptual or thinking disturbances; hyperactivity (at times); motor tension; emotional liability; flight of ideas; manic syndrome; pathologically inappropriate suspiciousness or hostility; pressures of speech; easy distractability; memory impairment - short-term; sleep disturbance; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week

- mental abilities and aptitudes needed to do unskilled work:
  - remember work-like procedures: unable to meet competitive standards
  - understand/remember short and simple instructions: unable to meet competitive standards
  - maintain attention for 2-hour segment: unable to meet competitive standards
  - maintain regular attendance and be punctual: no useful ability to function
  - sustain ordinary routine without special supervision: unable to meet competitive standards
  - work in coordination with or proximity to others without being unduly distracted: no useful ability to function
  - make simple work-related decisions: unable to meet competitive standards
  - complete normal workday and workweek without interruptions from psychologically based symptoms: no useful ability to function
  - perform at a consistent pace without an unreasonable number and length of rest periods: no useful ability to function
  - ask simple questions or request assistance: seriously limited, but not precluded
  - accept instructions and respond appropriately to criticism from supervisors: seriously limited, but not precluded
  - get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes: seriously limited, but not precluded
  - respond appropriately to changes in a routine work setting: seriously limited, but not precluded
  - deal with normal work stress: unable to meet competitive standards
  - be aware of normal hazards and take appropriate precautions: seriously limited, but not precluded
- Mental abilities and aptitudes needed to do semiskilled and skilled work
  - understand and remember detailed instructions: unable to meet competitive standards
  - carry out detailed instructions: seriously limited, but not precluded
  - set realistic goals or make plans independently of others: seriously limited, but not precluded
  - deal with stress or semiskilled work: unable to meet competitive standards
- mental abilities and aptitude needed to do particular types of jobs
  - interact appropriately with general public: unable to meet competitive standards
  - maintain socially appropriate behavior: seriously limited, but not precluded
  - adhere to basic standards of neatness and cleanliness: seriously limited, but not

precluded
- travel in unfamiliar place: no useful ability to function
- use public transportation: no useful ability to function

**Interpretive Report of WAIS-III and WMS-III Testing, Michael Kaiser, Ph.D., 1/10/07 (Tr. 267-79)**
- WAIS-III scores summary:
  - verbal: 78
  - performance: 90
  - full scale: 82
- WMS-III scores summary:
  - auditory immediate: 89
  - visual immediate: 91
  - immediate memory: 87
  - auditory delayed: 99
  - visual delayed: 84
  - auditory recog. delayed: 90
  - general memory: 89
  - working memory: 91
- summary of WAIS-III intellectual abilities: nonverbal reasoning abilities and working memory abilities are much better developed than verbal comprehension skills. Weakness in processing verbal information and thinking with words may considerably hinder patient in solving problems that are primarily language-based
- test results summary WAIS-III:
  - overall cognitive ability: low average range
  - verbal scale: borderline range
  - performance ssore: average range
- test results summary indexes:
  - verbal comprehension index: borderline
  - perceptual organization index: low average
  - working memory index: low average range
- test results summary WMS-III:
  - working memory capacity: average
  - immediate memory performance: low average
  - delayed memory: low average
- diagnoses:
  - Axis I: bipolar disorder 296.4; panic disorder 300.01
  - Axis III: rule out fibromyalgia
- summary and recommendations: functioning in low average range of intelligence. Complaints of difficulty remembering things, need for lists and need for family members to walk her through instructions appear to be a function of anxiety and racing thoughts secondary to bipolar illness; remains extremely anxious; experiences paranoia and panic attacks. Complaints of chronic pain in her legs, jaw, neck, and face that interfere with her ability to sleep and physically exert herself.

**Mental Residual Functional Capacity Assessment, Lynda Payne, Ph.D., 1/19/07 (Tr. 280-83)**

- understanding and memory
  - ability to remember locations and work-like procedures: not significantly limited
  - ability to understand and remember very short and simple instructions: not significantly limited
  - ability to understand and remember detailed instructions: not significantly limited
- sustained concentration and persistence
  - ability to carry out very short and simple instructions: not significantly limited
  - ability to carry out detailed instructions: not significantly limited
  - ability to maintain attention and concentration for extended periods: moderately limited
  - ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
  - ability to sustain an ordinary routine without special supervision: not significantly limited
  - ability to work in coordination with or proximity to others without being distracted by them: moderately limited
  - ability to make simple work-related decisions: not significantly limited
  - ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
- social interaction:
  - ability to interact appropriately with the general public:  not significantly limited
  - ability to ask simple questions or request assistance:  not significantly limited
  - ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
  - ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: moderately limited
  - ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness:  not significantly limited
- adaptation
  - ability to respond appropriately to changes in work setting: moderately limited
  - ability to be aware of normal hazards and take appropriate precautions:  not significantly limited
  - ability to travel in unfamiliar places or use public transportation:  not significantly limited
  - ability to set realistic goals or make plans independently of others:  not significantly limited
- functional capacity assessment: claimant functions in an generally independent fashion and can meet various personal needs; capable of completing daily living functions; can adequately negotiate in the general community; retains capacity to perform work-related tasks from a mental health perspective.  Due to recent anxiety, may function best in low

stress work environments where she has minimal contact with large groups of people or strangers.

**Psychiatric Review Technique, Lynda Payne, Ph.D., 1/19/07 (Tr. 284-97)**
- medical disposition: RFC assessment necessary
- categories upon which medical disposition is based:
    - 12.02 organic mental disorders - c/o memory and concentration problems, within average range
    - 12.04 affective disorders - bipolar
    - 12.06 anxiety-related disorders - c/o panic attacks and fear of going out, no dx by TS or CE
- rating of functional limitations
    - restriction of activities of daily living: mild
    - difficulties in maintaining social functioning: moderate
    - difficulties in maintaining concentration, persistence, or pace: moderate
    - episodes of decompensation, each of extended duration: one or two
- notes: claimant has a medically determinable impairment, but the conditions do not meet or equal listings

**Emergency Department Records, WMHS/Sacred Heart Hospital, 2/15/07 (Tr. 298-303)**
- chief complaint: chest pressure - she describes as panic attack
- clinical impression: noncardiac chest pressure, probable panic episode
- diagnostic imaging report:
    - findings: no acute pulmonary, parenchymal, or vascular abnormality suspected. Cardiac size and configuration are unremarkable. No hilar or mediastinal abnormality is suspected. No active pleural process is identified
    - impression: no cardiopulmonary abnormality

**Case Analysis, Bob Marinelli, Ed.D. 3/20/07 (Tr. 304)**
- reviewed all pertinent evidence in file and assessment of 1/19/07 - affirmed as written

**Progress Notes, James Holwager, Ed.D. 9/22/06-2/9/07 (Tr. 306-10)**
- 9/22/06: no longer thinks of killing herself; not able to function at work and is having difficulties functioning at home; disorientation is severe; anger is strong; very motivated to working on the problem. Continue supportive therapy and work on coping techniques.
- 11/10/06: anxious at beginning of session; thoughts seem to race so fast that she gets confused; pushes her anxiety to higher levels with her obsessive thinking. Work on thought stopping and exercises to relax.
- 12/8/06: angry moods that make it difficult for her to be around people on a continuous basis. Work on cognitive techniques for cognitive restructuring and thought stopping. Continue to encourage her to have a single psychiatrist that she can trust because the medication issue is a critical part of the treatment.
- 12/22/07: not quite as anxious; holidays are offering a healthy distraction to her most severe symptoms. Continue regular treatment to help patient deal with chronic mental

illness.
- 2/9/07: not as depressed but she is "just existing." Concerned about husband's stress level.

**Internal Medicine Examination, Stephen Nutter, M.D., Tri-State Occupational Medicine, 4/26/07 (Tr. 312-16)**
- chief complaint: bipolar; chest pain
- impression: chest pain; chronic cervical, thoracic and lumbar strain; no evidence of radiculopathy; asthma
- summary:
  - complains of chest pains; history seems atypical for angina. No evidence of congestive heart failure.
  - complains of back and neck problems; range of motion abnormalities of cervical and lumbar spine; straight leg raise test is negative; no sensory abnormalities; reflexes are normal; muscle strength testing is normal; findings are not consistent with nerve root compression; reports numbness in her arms at times
  - complains of shortness of breath; not short of breath with mild exertion or in the supine position. Lungs were clear of wheezes, rales, or rhonchi.

**Physical Residual Functional Capacity Assessment, Rogelio Lim, M.D., 5/7/07 (Tr. 317-24)**
- exertional limitations: none
- postural limitations: none
- manipulative limitations: none
- visual limitations: none
- communicative limitations: none
- environmental limitations: none
- symptoms: credibility questionable. Allegations out of proportion to objective findings. Chest pain not cardiac. Problem mostly psychiatric

**Progress Records, Melissa Robinson, DO, Winchester Medical Center, 9/12/06-11/26/07 (Tr. 326-43)**
- 9/12/06
  - current meds/med.problems: manic rage; depression; bipolar
  - target symptoms: angry mood; poor sleep; OCC SI, doesn't want to be here; rages frequently; no delusions; guilt; burdensome; racing thoughts
  - diagnosis: Axis I: bipolar - mixed; Axis II: OCD traits
  - assessment/change in treatment: continue Lamistal
- 9/26/06
  - target symptoms: rapid mood swings; forced to eat; no crying; no SI/HI; severe anxiety - fearful; no delusions; tired; poor concentration; pain worse all over
  - diagnosis: Axis I: bipolar - mixed
  - assessment/change in treatment: increase Risperdal; continue illegible
- 10/20/06
  - current meds/med. problem: can't go in public; angry

- target symptoms: poor appetite; no crying; severe anxiety; fearful; paranoid; low energy; poor concentration; body pain
  - diagnosis: Axis I: bipolar - mixed
  - assessment/ change in treatment: illegible
- 10/30/06
  - current meds/med. problem: "feels that she doesn't matter"
  - target symptoms: "overall better but bad days;" loss of appetite; feels alone; shaky; fearful; no patient; irritable; poor short-term memory; can't organize thoughts; feels worthless and helpless
  - diagnosis: Axis I: bipolar - mixed
  - assessment/ change in treatment: needs medical leave of absence
- 11/13/06
  - target symptoms: better mood; improving sleeping pattern; fearful; severe anxiety
  - diagnosis: Axis I: bipolar - mixed
  - assessment/change in treatment: continue current meds
- 2/19/07 Initial Psychiatric Evaluation
  - chief complaint: bipolar disorder type 1 with mixed episodees
  - mental status examination: alert and oriented; attentive; good grooming and hygiene; cooperative; friendly; clear and spontaneous speech; linear and logical thoughts without loose associations or flight of ideas; irritable and anxious mood; full range and appropriate affect; no hallucinations or delusions
  - diagnosis:
    - Axis I: bipolar affective disorder type 1 with mixed episodes; currently depressed
    - Axis II: deferred
    - Axis III: chronic fatigue syndrome; irritable bowel syndrome; hypertension
    - Axis IV: severe including chronic mental illness
    - Axis V: currently of 50
  - plan: change medications: Risperdal and Geodon at bed, Lamictal daily, and Xanax for panic only
- 3/21/07
  - mood swings are severe - depression to rage; anxious constantly; feels hopeless; body aches; fearful about social activities
  - neatly groomed; erratic mood
  - increase risperdal; lithobid; rozerem; illegible
- 8/8/07 Medication Management Progress Note
  - session content: panic attacks; shaky; chest pains; lightheaded; anger; no depression or sadness; irritable easily
  - plan: return visit; med management
- 10/12/07 Medication Management Progress Note
  - session content: upset; sleeping well; fair appetite; good energy; some angry spells
  - diagnosis: Axis I bipolar

- plan: return in 1 month; med management
- 11/26/07 Medication Management Progress Note
  - session content: "doing well;" sleeping well; good appetite; mild mood swings; some anger
  - diagnosis: Axis I bipolar
  - plan: return in 2 months; med management

**Office Treatment Records, Dr. Livengood, Fort Ashby Clinic, 1/2/07-1/5/07 (Tr. 345)**
- 1/2/05
  - patient getting Soma from multiple other providers; some concern about possibility that the prescriptions have been falsified. Not prescribing Soma in the future; cautious about prescribing Xanax
- 1/5/07
  - problem: HTN, hyperlipidemia, migraine headaches, bipolar disorder
  - subjective: patient gotten herself into trouble with prescription abuse; denies all charges that have been given to her. States she is anxious and is requesting Xanax
  - objective: lungs are clear; heart is regular
  - assessment: will not prescribe Soma or Xanax. Needs to see her psychiatrist for this medication

**Medical Records, Jean Ruiz, Valley Behavioral Health Associates, 1/11/08 (Tr. 347-50)**
- Initial Evaluation Update:
  - diagnosis:
    - Axis I: bipolar I mixed; generalized anxiety disorder
    - Axis II: diagnosis defined
    - Axis III: fibromyalgia, endometriosis; chronic fatigue syndrome; hypertension; Epstein-Barne; TMJ
    - Axis IV: chronic pain; economic and health issues
    - Axis V: Current CAG: 60
  - treatment recommendations: mood swings; pain; sleep
- Medication Management Progress Note
  - session content: extensive daily pain
  - diagnosis: Axis IV: chronic pain, economic and health issues
  - plan: confer with colleagues to diagnose fibromyalgia; continue current meds; requesting letter stating she has fibromyalgia for SSD application

D.    Testimonial Evidence

Testimony was taken at the hearing held on March 21, 2007. The following portions of

the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

| | |
|---|---|
| Q | How much do you weigh? |
| A | 120 pounds. |
| Q | Do you consider that normal? |
| A | No. |
| Q | What is normal? |
| A | 140. I've lost a lot of weight. |
| Q | Is there a reason? |
| A | Lack of appetite with this disorder. |
| Q | Which one are you talking about? |
| A | Bipolar. |

                       \*              \*             \*

| | |
|---|---|
| Q | Driver's license? |
| A | Yes. |
| Q | What state? |
| A | West Virginia. |
| Q | Are you able to drive? |
| A | Yes. |
| Q | Any limits when you're driving? |
| A | Just my glasses on my license. That's it. |

                       \*              \*             \*

| | |
|---|---|
| Q | How far did you go to school? |
| A | I went to 12th grade and some college in computer science, but no degree. |
| Q | Can you read? |
| A | I'm sorry. |
| Q | Can you read? |
| A | Yes. |
| Q | Can you write? |
| A | Yes. |
| Q | Can you count money, make change? |
| A | Yes. |
| Q | Add and subtract? |
| A | Yes, yes. |
| Q | Did you get a license as a cosmetologist? |
| A | Yes. |
| Q | So you attended cosmetology school? |
| A | Yes. |
| Q | Are you still licensed? |
| A | Yes. |
| Q | What state? |
| A | West Virginia and Maryland. |
| Q | Are you styling hair? Did you ever use it? |
| A | I did for a year. |
| Q | You said your onset date in your application is September 1, 2006. |
| A | Uh-huh, yes. |

| | |
|---|---|
| Q | Is that the date you last worked? |
| A | Yes. |
| Q | Have you not worked after that date? |
| A | No, sir. |
| Q | Are you working for cash? |
| A | No, sir. |
| Q | How do you keep your cosmetology license valid? |
| A | They charge a fee like of $25. You just send it in. You keep it valid as you would, say if someone works in a union hall or something to keep their - - |
| Q | But if you don't have to have any supplemental training or any type of - - |
| A | No. No, I do not. |
| Q | Are you doing any volunteer work? |
| A | No. |

*         *         *

| | |
|---|---|
| Q | The best you can. September of '06, what was your job? |
| A | September of '06 I worked at Allegheny County Economic Development. |
| Q | How many years did you work there? |
| A | Four. |
| Q | What was your job title or duties? |
| A | I was facility manager. |
| Q | I need to understand what you did there. |
| A | That is I'm in charge of all of Allegheny County's industrial park buildings, the maintenance of the buildings. I had an employee under me that I would see to it that he got with contractors to do sprinkler system, elevators, things of this nature. |
| Q | Was your work usually done in an office setting? |
| A | I was in the office usually, but I usually had to go out in the field as well because there was only two of us doing that job. I also had another title. I had two jobs in that. The other one was business retention, to retain the business that was already in Allegheny County. |
| Q | Did you have to travel in that job as well? |
| A | Yes. |
| Q | When you traveled, I'm assuming your geographical area was the County? |
| A | Yes. |
| Q | And you were driving to those locations? |
| A | I was either driving or a passenger, yes. |
| Q | When you weren't doing that you were in an office? |
| A | Office of field. |
| Q | Did you use a computer? |
| A | Yes. |
| Q | What other type of work did you do in the office? |
| A | Well, I was third hand, if you will. We all pulled together to answer phones, pull files, type letters, emergency situations would come up and I was on call 24-hours a day. I'd go out in the middle of the night. |
| Q | Why did you leave the work? |
| A | Why did I leave the work? |

Q       Yes.  Why did you stop?

A       The bipolar was getting to the point it was affecting my work.  The rage, depression was getting in the way of my work.  I was asked to take a couple of days off to see if I could get myself together.  That's when my husband realized there was something wrong with me and we went to seek help from a doctor.

Q       Prior to that, what did you do?

A       Prior to that I was in the Tax and Utility Office for Allegheny County Commissioners.

Q       How many years did you do that?

A       Three.

Q       You were working at a desk?

A       I was working at the front window, desk, up and down constantly, waiting on customers, taking tax bills, taking utility bills.

Q       What utilities did you handle?

A       Water, sewer and tax.  Your taxes.

Q       Personal and real estate?

A       Yeah.  And business.

Q       Business taxes?

A       Business, uh-huh.

Q       Did you do that job seated at the window on a stool like some of the other clerks do?

A       No.

Q       So you had to stand at the window?

A       I was constantly up and down, up and down.

Q       So you had a desk and then you had a place in the window and you would move - -

A       Yes, at which you just go up and you wait on the window and then go back to your desk and you - -

Q       Use a computer and that type of thing?

A       Yeah, finish doing what you were doing before.  Either putting in utility bills that someone had paid or counting your drawer.  You could your drawer five or six times a day there.  That's how much money t hey were bringing in.

Q       And you changed jobs because you thought the - -

A       I was asked to change jobs because they wanted me in economic development.

Q       Now before that, what did you do?

A       I worked for the election board of Allegheny County Economic Development.

Q       What did that require?

A       I was basically the secretary/receptionist.  I was the lowest person in there that was working the window.

Q       Does that office register voters?

A       Yes, that's what I did.

Q       Does it make up poll books and things like that to send out to the - -

A       Yes, yes.  And we'd do the machines.

Q       Is that computer?

A       At that time we did the machines.

Q       Voting machines?

A       The big voting machines.

Q       But you weren't required to transport machines or anything like that?

A       No, but I was required to set them.

Q       Did you teach election classes?

A       Yes, I did.

Q       Otherwise, just kept registered voters' records?

A       And make sure that they weren't duplication in Maryland and West Virginia or Pennsylvania or whatever.

Q       Or voting as dead people.

A       Or jail.  In jail.

                    *                    *                    *

Q       So you did that job for eight years?

A       Yes, I did.  Yes, I was there the longest.  I started in 1990 there as a contractual employee and then they moved me into a permanent position.

Q       Anything else about your duties that I wouldn't understand unless you told me?

A       There was a lot of, I hate to use this word, I did a lot of men's work, if you would. I was expected to lift, carry, do the things that the men did.

Q       Well, how heavy and how much lifting did you do in the elections office?

A       In the election office it wasn't anything because that was just - - I'm talking economic development mainly.

Q       That's the last job you held.

A       Yeah.

Q       What was the heaviest?

A       I'd say 50 or 60 pounds.

Q       What were you lifting for 50 or 60 pounds?

A       Oh, my.  I would have to lift the big hoses they would use to flush out sprinkler systems.  I would have to help the elevator man that was just out there today.  Lift his tools. Take his tools up steps.  There are so many different things I can't even mention.  I mean, anything they asked me to do, I did it.

Q       You said when you made your application that you went on family medical leave.

A       Yes, sir, I did.  I was asked to do that.

Q       How long have you been drawing your leave?

A       I drew my leave until it ended.

Q       How long was that?

A       That was from September 1, 2006, until December - - and don't hold me to the date - - 21, 2006, when my State Disability Retirement went through.

                    *                    *                    *

Q       When you made application you said specifically that bipolar and all of the conditions related to issues dealing with mental: irritability, rage, personal weakness.

A       Yes, yes.

Q       I don't know.  It's kind of a self analysis here, but inability to concentrate and low energy, interest, guilt, whatever.

A       It's a self analysis because, yes, sir, that's what I was going through. Yes.

Q       Yeah, that's what I mean. But it was as of September of 2006?

A       Yes, sir.

Q       Is that pretty much what we're dealing with here today? Anything else? You said you have back problems?

A       I have chronic pain everywhere. Lower back and upper back is mainly my most excruciating pain.

Q       Do you take pain medicine?

A       No, I do not.

Q       Have you had any surgeries on any physical issues?

A       No. I have endometriosis.

Q       Anything scheduled for you?

A       No.

                            *               *               *

Q       Any therapy? Physical therapy?

A       No.

Q       Do you use a brace, crutch, wheelchair, cane? Do you use a TENS unit or anything for pain? Do you know what a TENS unit is? Okay. You said the pain was located throughout your whole body but mostly in your back?

A       Yes, and sometimes when it is severe I cannot even stand a sheet or a cover.

Q       What makes it worse? What aggravates it for you?

A       When the bipolar flares up it - -

Q       I'm thinking of your back pain.

ATTY       I was going to say. I think what she's going to tell you is that she believes that the bipolar and this problem are connected.

CLMT       Yes, they are. My nerve endings are very sensitive to the pain, severe headaches, loss of vision.


BY ADMINISTRATIVE LAW JUDGE:

Q       What psychotropic medications do you take? In other words, for your mental status, what are you on now?

ATTY       Your Honor, for the record, the claimant indicated to me that she does have a problem remembering medications. I asked her to bring her pills bottles with her today if that would be all right.

BY ADMINISTRATIVE LAW JUDGE:

Q       I was looking at the E section if there was a list of the medications filled out and filed. I didn't see one.

A       Risperdal, Lithobid, Geodon, and this one is Rozerem to help me sleep.

Q       Were all these prescribed by the same - -

A       Well, my one psychiatrist left. She went to another state far away. But, yes.

Q       Is this the Behavioral Health?

A       Yes.

Q        Is that where you go?

A        Yes.

Q        How long have you been there?

A        Behavior Health.  I went there - -

Q        Since '06?

A        - - in '06, yeah.  And I take Wellbutrin, which is an antidepressant, and it's working.  And then I take my other, which is high blood pressure and things like that.  But those are for the bipolar.

Q        Any side effects?

A        Dry mouth.

*                    *                    *

Q        In the record that I reviewed, some time in '07, I'm not exactly sure, you went to the Fort Ashby Clinic.  The doctor said it was brought to his attention that you're getting Soma from multiple other providers.  There's some concern about the possibility that these prescriptions have been falsified.  I will not prescribe Soma for this patient in the future and will be very cautious about prescribing even Xanax.  At that time, he listed Allegra - -

A        Oh, I do take Allegra-D.

Q        - - verapamil - -

A        Verapamil's for my high blood pressure.

Q        - - LoEstrin - -

A        What's that?

Q        - - Risperdal, lithium.

A        I think he listed those because that's what I was taking from my psychiatrist.  He listed my medication I was taking.

Q        What about Xanax and Soma?

A        No, I do not.

Q        Where did he get this?

A        He prescribed them to me for 15 years and I went off of them by myself because - -

Q        You're not seeking that type of a medication - -

A        No.

Q        - - from different providers?

A        No.

Q        Where did he get the multiple providers from?

A        I have no idea.  What upset him was he diagnosed me with bipolar.  I went to seek a second opinion from Corrine Kimball, and I think that upset him.

Q        Is Kimball your doctor?  Or who's your psychologist or psychiatrist?

A        My psychiatrist is Caliphat.  I keep forgetting her name.  Dr. Caliphat.

Q        That's at the Behavioral Health?

A        Yes, and my counselor is Jim Holwager [phonetic].

Q        How often do you go now?

A        I go once a month to each.

Q        That's been since '86?

A        '06.

22

Q        '06.  August of '06.

A        I could have went in '86, probably.  But yeah, '06.

Q        I understand.  August of '06 is approximately is when you first went in there?

A        Yes.

Q        Do any of your conditions affect your ability to walk?

A        At times, yes.

Q        How far can you walk today?

A        I can walk the distance we walked here.  I walked from the car lot in.

Q        Let's assume that I don't know where you parked.

A        Out here in the parking lot.

ATTY        The hotel parking lot?

CLMT        The hotel parking lot.

ATTY        It's the one that you come down George Street.

ALJ        Above the hotel.

ATTY        It's past the hotel if you're coming from whatever - -

ALJ        100 yards?

ATTY        Yeah.

BY ADMINISTRATIVE LAW JUDGE:

Q        Sitting.  How long can you sit?

A        Two hours is pushing it.

Q        Standing?

A        Standing is the worst.  We're talking when I was at the tax office, 15 to 20 minutes to wait on a customer and I was feeling the pain.

Q        Can you bend forward at the waist?

A        Yes, with pain.

Q        Can you bend your knees and squat?

A        Yes, with pain.

Q        The pain is in your knees and back?

A        Yes, I have started having severe pain in my knees.

Q        Are you right-handed or left?

A        I'm right-handed.

Q        Any problems with your hands?

A        Yes, my right hand goes numb continuously.

Q        Make a fist with both your hands.  Any problem doing that?

A        No.

Q        If you lay your hands on a hot stove or touch a hot curling iron, would you know it?

A        If this hand was numb, no.

ATTY        Indicating the right hand.

CLMT        I'm right-handed.

BY ADMINISTRATIVE LAW JUDGE:

Q        How frequently does it get numb?

A        Like this morning when I was curling my hair, which is why I couldn't finish it, it gets numb.  Ironing, it gets numb.  Writing.

23

Q       You're taking blood pressure medicine?

A       Yes.  Writing, it gets numb.

Q       Can you hold a fork and spoon with your hands?

A       It will get numb.

Q       Can you button your shirt, blouse, things like that?

A       It will get numb.

Q       Lifting on a routine basis, how much weight?

A       I can lift one of those water jugs to put on the water things or 50 pounds, but I force myself to do it.  I get in trouble.  But there's no one around to do it but me.

Q       That's not routine though, right?

A       No, that's only once a month.

Q       Something you do routinely?

ATTY       How about a gallon of milk?  Can you lift a gallon?

CLMT       Yes, I get a gallon of milk.  My groceries.  My groceries is very strenuous on me.

ALJ       She hasn't seen my wife's grocery bags.

BY ADMINISTRATIVE LAW JUDGE:

Q       Give me an idea of what you carry in a grocery bag.  10 pounds, eight pounds, six pounds?

A       No, five pounds maybe.

Q       Do you have problems with memory?

A       Yes.  Yes, sir.

Q       How would you describe the problem to me?

A       Memory loss.  That's why I actually wrote notes down today, but I wasn't going to put them out here because I didn't know if you would object or not.

Q       Well, certainly not.  Between you and your attorney I would get - -

A       Because I can't remember things.

Q       Well, sure.  I understand.  How about watching t.v.?  Can you follow a program on t.v.?

A       I can watch sitcoms.  I cannot follow movies very well.  I cannot follow instructions very well.

Q       Do you have a computer?

A       Yes.

Q       Is it connected to the internet?

A       Yes.

Q       Do you email?

A       Yeah, but my spelling's not very good with my email.

Q       How often are you on the computer a day?

A       Not very often.   I check my email because my mother's in Wyoming.    So I check my email once a day, twice a day.

Q       For how long?

A       15 minutes by the time it takes to get up.

Q       Do you have problems with crowds of people?

A       Yes.

Q       How many make you uncomfortable?

A       I will go into the market or Wal-Mart. I get very paranoid. I will leave a buggy of groceries or whatever there and sit and leave. I'll just leave.

Q       What's the number then that makes you uncomfortable.

A       This makes me uncomfortable.

Q       What do you perceive here?

A       I would say 10 people in a room. I feel claustrophobic.

Q       Strangers a problem for you?

A       Yes.

Q       And you go to treatment once a month?

A       Yes.

Q       You see a therapist and a psychiatrist every month?

A       Uh-huh. Sometimes I see my counselor twice a month.

Q       During any of this period that you've alleged disability, have you been hospitalized because of your condition, mental?

A       No.

Q       Do you have any difficulty breathing?

A       I have asthma.

Q       What do you take for asthma?

A       It's called Intel [phonetic], I think. Intal. It's a rescue inhaler is what it is.

Q       What makes it worse?

A       The pollen, cigarette smoke, heaviness in the air.

Q       Do you smoke?

A       No, I do not.

Q       Have you ever?

A       No.

Q       Do you wear glasses?

A       Yeah.

*           *           *

Q       Do you know what your eye deficit is? What is your vision deficit? Close up, far away, astigmatism?

A       I am near-sighted. I can't see far away.

Q       Do you have hearing aids in your ears?

A       No.

Q       Any difficulty hearing me today?

A       Just sometimes. Not all the time.

Q       Is it because I'm not loud enough?

A       Yeah.

Q       How many hours a night do you average sleeping?

A       Anywhere from four to seven, and that's just recently.

Q       How would you describe your night?

A       My night is very not a restful sleep because of the pain. I usually end up going to the couch or another bed or stay up all night.

Q       With respect to your ability to take care of yourself - -

A Yes.

Q - - your personal - -

A Hygiene?

Q Can you shower, bathe, dress yourself, do your hair, wash your hair, provide your personal hygiene requirements including toileting and things like that - -

A Yes.

Q - - without help or assistance?

A Yes.

Q Who does the cooking for you and your husband?

A I do.

Q Do you eat out a lot?

A No.

Q Is that all you cook for is you and your husband?

A Yes.

Q On a typical day, what time would you find yourself up in the morning for the last time?

A 6:00.

Q And what will you do?

A Well, that's what time he gets up to go to work.  This morning I was up at 3:30 because I knew I had to come here.  I was very anxious and that's what happens when I know I have to go somewhere.

Q If you have a bad day, is it still 6:00 in the morning?

A It's earlier than that.

Q So how will you spend your time after you get up at 6:00?  Do you have to fix breakfast or anything?

A No, I don't fix breakfast.  I do the dishes.  I might do some laundry, fix the fire. Now this has to be done at my own pace because - -

Q Do you cut and load firewood?

A I don't cut it but I do load - -

Q Do you load it in the house?

A I do the woodstove.

Q Is it a woodstove?

A Yes.

Q You bring it in from the outside?

A One piece at a time.  Yeah, it's just right around the corner.

Q You do laundry one time a month, a week?

A Oh, no.

Q Whenever you need it?

A I do two loads a day, but not every day because it's just me and him.

Q As you need it?

A As I need it.

Q Is your home one or two stories?

A It's two.

Q Washer and dryer in the basement?

A       Top floor.

Q       Is that the floor you live on, the top?

A       That's the bedroom, kitchen and stuff like that.  The basement's just a finished basement.

Q       You don't use that?  You don't go downstairs?

A       Yes, I do.

Q       Is that your family room?

A       Yes.

Q       How many steps would you say you negotiate every day?

A       There's 13, probably.  And I have fallen down them.

Q       So are you able to do the grocery shopping?

A       Grocery shopping is becoming hard for me.  The last few times I've went I've had my sister-in-law to go with me because I cannot remember what to get.  I have the list, but I still don't get what's on the list.

Q       Do you have any relatives or family in the area?

A       My brother and sister-in-law right now.

Q       Do you see them?

A       They're living in my driveway.

Q       I'm sorry?

A       They're living in my driveway right now.  They moved from Colorado.  They're moving back here, yeah.

                               *               *               *

Q       Do you see your mother, your dad?

A       My mom and dad has moved to Wyoming.

Q       Wyoming?

A       I do not see them.

Q       Do you have any hobbies to activities?

A       Not that I'm interested in.  That's part of the bipolar, lack of interest in everything.

Q       But no t.v.?  No computer?  Nothing?  No reading?

A       I cannot read.  I cannot read and comprehend it.

Q       So you don't?

A       No.  Like I said, t.v. is a short, half-hour, Everybody Loves Raymond show or something like that.  I forget how to cook some recipes, so suppers are usually a one pot meal.  Sometimes I can't even fix supper because I can't - -

Q       What have you given up?  What are some of the things you'd do that you can't do now?

A       Just go to town to shop.  I don't even like to shop.  Just when to shop.  I can't do that.

Q       Belong to any clubs, organizations, churches, lodges or attend meetings?

A       No.

Q       You don't garden?

A       No.

Q       Flowers?

A     No.

Q     Crosswords puzzles?

A     No. And those are the things I was interested in before.

Q     Occasional t.v. during the day?

A     The t.v. will be on just to give me some noise in the house.  That's it.

Q     Do you research your mental health and physical ailments on the computer?

A     No, I do not.  I don't have to.

        *            *            *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q     As far as your activities of daily living around the house, how about the cleaning and the dusting and that type of stuff?  Do you do any of that?

A     I do that.  That takes me three days to clean my house where it used to take me just one day.

Q     Why does it take you longer now than it used to?

A     I can't do it.  It's too painful and the lack of interest.

Q     How about things like paying bills, going to the post office, public transportation, or taking a telephone number from directory assistance?  Can you do that?

A     Paying bills have become difficult.  It's gotten me into some financial problems.

Q     Why has paying bills become difficult?

A     When I write a check out it might be $133 and some odd cents.  I might forget the 30 or the 3.  I might forget to sign the check.  I have turned the bill around and sent it back to myself.  It's just the lack of, what word do I want to use, concentration.  The lack of concentration.  I'm distracted easily.

Q     His Honor asked you about your personal care like your grooming, your dressing, your bathing, and you indicated you could do that.  Do you do that in a normal manner, in the same manner as before you had this situation, or do you have to do it differently?

A     I do it much faster.  I take a shower and get it over with and get it out.  I used to take long baths, relax.  I don't even do that.  It's a burden.  It's a burden for me to do that.  I get it over with.

Q     His Honor may have covered this.  I'm not certain.  On a typical day, what do you do to occupy yourself during the day?  I know you said you got up at 6:00 a.m. and did some things, but what do you do during the day?

A     Well, since my brother and sister-in-law are there, they are keeping me somewhat occupied because they know that I am anxious.  I have panic attacks.  Sometimes, they're opening a business, I will help them with that or give ideas.  They make me feel like a part of it.  But other than that, I have to fix lunch for my husband.  I iron his clothes, but I have to do it at my own pace.  Just like today, coming here, it took two hours to get ready just to come in here.

        *            *            *

Q     In a 30 day period, how many bad days would you have versus how many good days do you have?  Like I say, in a typical 30 day month?

A     That's very hard to - - 30 days, at this point I would say probably 20 good days.  No, 20 bad days.  20 bad days and 10 good days being irritable.

Q     Could you tell His Honor what you consider a to be a bad day?  What's going on with you?

A       I wake up angry, enraged. First of all I'm angry that I woke up.

Q       Take your time.

A       I don't want to cry. Anyway. The change of personality, severe mood swings, the loss of what I consider my intelligence. The lack of interest when it's a bad day. I can't do anything. I don't want to do anything. I don't want to have anybody around me. I will start a project to do the kitchen dishes. I run the water and then decide, well, I better wash my face. So I go back and wash my face and then I come out and the kitchen sink is still running full of water and it's run over. So I have no train of thought or remembering those type of things. For example, I burnt iced tea. I left it on the burner. The smoke alarms went off. It was that bad. Detergent. I will do the laundry and not put detergent in the laundry.

One thing that my counselor definitely wanted me to point out to you is I was at a doctor's appointment and I had to get to Virginia Avenue. I knew where Virginia Avenue was but I couldn't get there. I had to call my husband in a panic to help me get there. So I have to constantly have a support line, if you will, that I can call if I'm in panic or anxiety. And I was hospitalized as an outpatient February 15th for a severe anxiety attack. I thought I was having a heart attack. I fall down a lot. I'm clumsy, dizzy.

My thoughts are sporadic when I have a conversation. This has been brought to my attention. I don't know I do it. My thoughts are sporadic. I'll be talking about one thing and then I'll go to another and then another. I don't know I do that. My family members have told me that I'm very, very mean. I don't know I'm doing that and they're calling me on it and telling me, these are the things that you're saying that's hurtful.

Q       How about a good day? How is a good day better?

A       Yesterday I went up and got a used car. That was a good day other than I was exhausted. I came home and I went to bed. On a bad day, I explained those things to you, I'm in bed at 4:00 p.m. My husband gets home at 7:00 to 8:00. I will get up, greet him, take my bath, I'll go back to bed. I'm just in a fetal position. I'm done.

Q       For the rest of the day?

A       For the rest of the day I'm done.

                    *              *              *

Q       Let's talk a little bit about this rage. First of all, could you tell His Honor what happens when you have one of these rage episodes or rage attacks or whatever you want to - -

A       I can give you an example that sticks in my mind. I nearly got fired. My immediate boss wanted me to do something and I could not get my project done without another employee giving me what he had and he kept putting it off. I told my boss that and he told me that was no excuse and he didn't want to hear that. That was on my lunchtime. I simply threw my lunch in my bag and I said, well if you don't want to hear that you can do it yourself. I simply got up and walked off the job. I came back to the job, but I was red and enraged and if I could have struck him I would have, but I had to walk away. I was in that much of a rage. And rage with my husband has put a strain on my marriage. Things like that. But I have that under control with the Wellbutrin and things are given me. And this, I never did cry. But they tell me it will come and go. The feeling of worthlessness, hopefulness, the emotional withdrawal, I still have all that.

Q       When you have a rage attack or incident do you get any kind of warning or does it just happen?

A        It snaps.  It snaps like that.  In a matter of a second I can be in the corner, ready to be in the fetal position.  It's that quick.  I am just up and down so quickly.

Q        Have you ever attempted suicide with a plan?

A        Yes.

Q        What did you do?

A        I took a bottle of pills.  I don't even know what they were.  But I survived that and I survived the accident, so apparently I'm not supposed to die.  I say that with a laugh, but I've tried everything.  I don't want to be here.

*                    *                    *

BY ATTORNEY:

Q        Let me ask you this.  Just a couple more questions.  When you describe your night as not a restful sleep, what do you mean by that?

A        I don't feel rested when I wake up.  I don't feel like I used to, like say when I was in middle school where I'd have a good night's sleep and wake up ready for the next day.  I feel like I haven't even been to bed.

Q        When that happens, what affect, if any, does that have on your functioning during the day?

A        Really none.  I've went three weeks with no sleep before and I can't even tell I didn't have any sleep.  Then I'll go for two weeks and do nothing but sleep.

Q        One last question about this diffuse pain.  You have the pain primarily in your back, as I understand it, and in your arms?

A        It's in my hand.

Q        Right hand?

A        My right hand, and it's in my fingers that go numb and through up into here.  This one does nothing but just hurt.

Q        Indicating the left.  Are they the only places that you have the pain?

A        The neck.

Q        In the neck?

A        Neck, temples.  I have to wear a ice pack.  Last night I had to put a ice pack on top of my head because it felt like the top of my head was going to blow off.  Anything to calm myself down, to try to get myself calm.

*                    *                    *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Ms. Evans' profile is between the ages of 40 and 42, because I think she's within six months of her next birthday.  She has a high school education and she has some college courses, but definitely certification as a cosmetologist, and the past three jobs that you identified ranging from sedentary to the light as performed unskilled to skilled.  From the physical standpoint at the time the application was made based upon the analysis, no physical exertional limitations were considered.  I just want to start with the medium exertional level of work.

*                    *                    *

Q        In order to expedite the process in response to that hypothetical, I would keep the hypothetical the same and I will change the exertional level all the way down to sedentary.  So perhaps you could just provide a gamut of any jobs, if any, that you could identify in the national

or regional economy in response to the hypothetical, and then I will change it to the light, and then I will change it to sedentary.

A    So first medium?

Q    Medium, yes. I just wanted to, while you were considering the question  you'll be able to - - I think I have another attorney out there that is going to be coming through the wall here in a minute.

A    Yes, Your Honor. I'll define the local economy as 20% of all jobs in the State of Maryland and 10% of jobs in the States of Pennsylvania and Virginia, based on Bureau of Labor statistics.

At the medium level there would be the work of a kitchen helper. In the local economy there are 1,301 jobs, in the national economy 203,963 jobs. There would be the work of a commercial cleaner. In the local economy there are 6,011 jobs, in the national economy 1,062,720 jobs. There would be the work of an equipment cleaner. In the local economy there are 982 jobs, in the national economy 201,124 jobs.

At the light level there would be the work of a marker. In the local economy there are 1,041 jobs, in the national economy 184,281 jobs. There would be the work of a mail clerk. That would be an individual working in a private facility I a mailroom as opposed to working for the postal service. In the local economy there are 625 jobs. In the national economy 82,490 jobs. There would be the work of a sewing machine operator. In the local economy there are 597 jobs, in the national economy 118,906 jobs.

At the sedentary level there would be the work of a document preparer. In the local economy there are 349 jobs, in the national economy 62,756 jobs. There would be the work of a table worker. In the local economy there are 78 jobs, in the national economy 14,749 jobs. There would be the work of an ampule sealer. In the local economy there are 81 jobs, in the national economy 13,189 jobs.

Q    Consider the testimony that Ms. Evans made. Assume that I find the testimony to be credible, good, supported by our medical evidence of record. Because of her testimony and the corresponding medical evidence that supports the conditions there would be no work at medium. That's 50 pounds occasionally, 25 pounds frequently. No work at light lifting 20 pounds occasionally, 10 pounds frequently. Or no work at sedentary lifting 10 pounds occasionally, 5 pounds or less on a frequent basis. All of the unskilled and skilled work that she did in the past would not be available to her because of her inability to perform it. She would have no ability to do even unskilled work. The concentration, persistence and pace would rise to the level of marked. By marked I mean she would be off task more than 10% of the time in an eight hour work day. Her condition would result in absences which would exceed the vocationally acceptable number by employers in the workplace to be away from the job in a given month, generally, which I understand to be perhaps as many as three to four absences a month, and any other fact or facts which you may have heard from her testimony to support such a hypothetical. If that would be the case, would there be any jobs that such an individual could perform?

A    No, Your Honor. There would be no jobs for this hypothetical individual.

                        *        *        *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q    Sir, have you had an opportunity to review Dr. Robinson's residual functional

capacity, which I believe is 5-F of the exhibits, dated 10/20/06?

A        No, I didn't.

*         *         *

ATTY       I gave him the paper copy I had, Your Honor.

VE           Was there a certain section of it you would like me to focus on - -

BY ATTORNEY:

Q        No.

A        - - or just in general?

Q        Just in general.

A        Well in general, first of all it says that the individual would be absent more than four days a month.  That would preclude employment in itself.  There are other areas, mental abilities and aptitudes needed to do unskilled work, unable to meet competitive standards was primarily checked off.  So for at least even just those reasons, that would preclude work.

Q        Again, have you had an opportunity to review the mental RFC by Mr. Holwager, which is dated 11/17/06, which is 7-F of the exhibits?  If you haven't it's marked there on the little  tab down below.

A        This individual pretty much indicated very similarly, absent four days per month. As far as abilities and aptitudes needed to do unskilled work, primarily unable to meet competitive standards.  An individual with those limitations would be precluded from employment.

Q        Thank you.

*         *         *


E.       <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- has a license and is able to drive (Tr. 32, 183)
- is able to read and write (Tr. 33)
- is able to count money and make change (Tr. 33, 160)
- sometimes has trouble walking (Tr. 46-47)
- can stand for two hours (Tr. 47)
- is able to bend at the knees and waist (Tr. 47)
- has trouble when using her right hand because it sometimes goes numb (Tr. 48)
- is able to carry grocery bags (Tr. 49)
- has memory loss (Tr. 49)
- is able to watch sitcoms (Tr. 49)
- has trouble following movies (Tr. 49)
- has a computer and is able to use email (Tr. 49-50)

- is uncomfortable in crowds of people (Tr. 50)
- sometimes has difficulty sleeping (Tr. 52, 181)
- is able to take care of her personal hygiene (Tr. 52, 158, 181)
- cooks, washes dishes, and does laundry (Tr. 52-54, 159, 181-82)
- brings in firewood from the outside and loads it in the wood stove (Tr. 53, 182)
- has a two-story home and is able to climb stairs (Tr. 54)
- has difficulty grocery shopping (Tr. 54-55, 160)
- does not have any hobbies (Tr. 56, 161, 184)
- can no longer go shopping (Tr. 56)
- cleans her house (Tr. 57, 159, 181)
- has trouble paying bills (Tr. 57, 159-60, 183-84)
- fixes lunch for her husband (Tr. 58, 158, 181)
- irons clothes (Tr. 58, 158, 181)
- takes care of pet dog (Tr. 158, 181)
- does not do yard work (Tr. 160, 183)
- goes outside 2-3 times each day (Tr. 160)
- goes outside very little (Tr. 183)
- cannot use a savings account or use a checkbook/money order (Tr. 160)
- cannot count change or use a checkbook/money order (Tr. 183)
- can handle a savings account, but it is difficult (Tr. 183)
- talks to family on the phone (Tr. 161)
- sometimes has trouble with social interaction (Tr. 162, 185)
- has trouble paying attention for longer than 3-5 minutes (Tr. 162, 185)
- does not follow written or spoken instructions well (Tr. 162, 185)
- 

## III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant argues that the ALJ's decision to deny the Claimant DIB is not supported by substantial evidence because the ALJ failed to take give appropriate weight to the opinions of Dr. Robinson and Dr. Holwager, both of whom were treating sources.  Claimant also argues that the ALJ failed to evaluate Claimant's complaints of pain and how it impacted her RFC.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the ALJ considered and articulated his rationale and basis for giving little weight to the opinions of Drs. Holwager and Robinson.  Commissioner also contends that the ALJ thoroughly analyzed the extent and persistence of Claimant's subjective complaints of pain and articulated

the basis for his conclusion that Claimant "exaggerated the nature and extent of her impairments."

B.    Discussion

1.    Whether the ALJ Gave Appropriate Weight to the Medical Evidence Submitted by Treating Physicians.

Claimant argues that the ALJ's decision was not supported by substantial evidence because the ALJ accepted the opinions of the non-examining DDS medical consultants regarding Claimant's Residual Functional Capacity and failed to properly consider the Mental Residual Functional Capacity assessments by Claimant's treating physicians, Drs. Robinson and Holwager. Additionally, Claimant argues that the ALJ failed to articulate any reason, rationale, or basis for completely rejecting the assessments submitted by Claimant's treating physicians. Commissioner contends that the ALJ did consider and articulate his rationale for giving little weight to the unsupported statements of Drs. Holwager and Robinson. Specifically, Commissioner contends that the ALJ complied with the regulations because it is the ALJ's sole responsibility to determine Claimant's disabled status and that the ALJ adequately explained his reasoning for rejecting the opinions by setting forth inconsistent objective medical evidence.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court

34

is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence."  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ.  20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1).  Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements.  Id.  The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2).  See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician is entitled to great weight,

it may be disregarded if there is persuasive contradictory evidence.  Evans, 734 F.2d at 1015.  To

decide whether the impairment is adequately supported by medical evidence, the Social Security

Act requires that impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell,

461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human

Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Courts evaluate and weigh medical opinions

pursuant to the following non-exclusive list: (1) whether the physician has examined the

applicant; (2) the treatment relationship between the physician and the applicant; (3) the

supportability of the physician's opinion; (4) the consistency of the opinion with the record; and

(5) whether the physician is a specialist.  20 C.F.R. § 404.1527(d)(2) (2005).  Courts often

accord "greater weight to the testimony of a treating physician" because the treating physician

has necessarily examined the applicant and has a treatment relationship with the applicant.

Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  However, "although the treating physician

rule generally requires a court to accord greater weight to the testimony of a treating physician,

the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v.

Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

Claimant argues that the ALJ failed to properly consider the RFC assessments completed

by treating sources, Drs. Robinson and Holwager.  In doing so, Claimant submits that the

opinions of the two treating sources should be given controlling weight in accordance with SSR

96-2 or, alternatively, that the ALJ failed to ascribe any weight or consideration to the treating

sources' medical opinions in accordance with SSR 96-2p.  Claimant is correct in her statements

regarding the requirements for explaining the weight given to a treating source's medical opinion

under SSR 96-2p; however, Claimant fails to realize that the opinions of the treating physicians at issue were on Claimant's disabled status.

The ALJ afforded little weight to the opinions of Dr. Robinson and Dr. Holwager "on the ultimate issue reserved to the Commissioner (Social Security Ruling 96-5p) as they are not supported by the overall medical evidence of record or their own records." (Tr. 21). SSR 96-5p explains how ALJs are to consider medical source opinions on issues reserved to the Commissioner as set forth in 20 C.F.R. § 404.1527. Opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Moreover, the ALJ is not obligated to "give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2)." § 404.1527(e)(3). The ALJ's only obligation is to "review all of the medical findings and other evidence that support a medical source's statement that you are disabled." § 404.1527(e)(1).

In rejecting the opinions of Drs. Robinson and Holwager on Claimant's disabled status, the ALJ did consider the following objective medical evidence of record:

> On October 10, 2006, the claimant reported that her mood shifts were not as rapid and her mood was 'not as bad.' On October 30, 2006, the claimant reported her mood as 'overall better but bad days.' The psychiatrist reported that the claimant was improving gradually and noted that the claimant had requested a medical leave of absence. On November 13, 2006, the claimant reported that her mood was 'a little better.' The psychiatrist reported that the claimant was alert and oriented times four, linear, logical and mildly anxious. Despite the finding of only mild anxiety, the psychiatrist then prepared a letter stating that the claimant was essentially disabled completely in all spheres of her life by this illness. . . . On March 21, 2007, the claimant reported that her mood swings were severe even within the day, ranging from severe depression to rages. However, the psychiatrist reported that the claimant was neatly groomed, linear, and logical without psychosis or suicidal or homicidal ideation. On April 2, 2007, the claimant's therapist prepared a letter stating the claimant's bipolar disorder would

make it very difficult if not impossible for her to work a normal routine (Exhibit 14F). . . . The record contains no further reports of treatment until August 8, 2007, when the claimant reported panic attacks every morning and Xanax was prescribed.

(Tr. 19-20).

The ALJ had substantial evidence to exclude the opinions of Drs. Robinson and Holwager as to the ultimate issue of Claimant's disabled status. Therefore, the ALJ did not err.

2.    Whether Substantial Evidence Supports a Finding that Claimant was not Entirely Credible.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to evaluate Claimant's complaints of pain and how that pain impacts her RFC. Specifically, Claimant alleges that the ALJ failed to set forth any analysis to support his conclusion to discredit Claimant's subjective complaints as to the intensity, persistence, and limiting effects of her symptoms. Commissioner contends that the ALJ thoroughly analyzed the extent and persistence of Claimant's subjective complaints of pain and articulated the basis for his conclusion that Claimant had "exaggerated the nature and extent of her impairments."

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is

supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant relies on SSR 96-7p in arguing that, when making a credibility determination, the ALJ must "set forth specific reasons for the finding on credibility, supported by the evidence in the case record and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the adjudicator gave to the individual statements and the reason for that weight."[5]

In coming to his conclusion that "Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible," the ALJ complied with the two-part test in <u>Craig</u>. First, the ALJ found, in accordance with step one, that "claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms." (Tr. 17). Second, in accordance with step two, the ALJ dedicated nearly five pages of analysis explaining his reasoning for discrediting Claimant's testimony. (Tr. 17-22).

In his detailed analysis, the ALJ examines each of Claimant's subjective complaints in turn citing contrary objective medical evidence. First, the ALJ addresses Claimant's alleged chronic pain throughout her body and determines that the "medical evidence of record contains little evidence to support this allegation." (Tr. 17). In coming to this conclusion, the ALJ cites multiple medical records including a report dated May 12, 2006, in which Claimant alleged muscle aches after trying "Vytorin, a cholesterol lowering drug which lists muscle aches as side effect. The claimant's medication was changed. The records of this physician contain no further complaints of muscle aches (Exhibit 2F)." (Tr. 17). A second report dated April 26, 2007, in which Claimant complained of pain in the back and neck was also used to discredit Claimant's

_____

[5] Pl. Br. P. 23.

testimony because the "evaluator reported that the claimant ambulated with a normal gait, did not require a handheld device, was stable at station, and appeared comfortable in both supine and sitting positions. The examiner found no redness, warmth, tenderness or swelling of any of the claimant's joints. He reported that the claimant had pain with range of motion testing of the cervical and dorsolumbar spine but straight leg raise testing was negative and there was no evidence of paravertebral spasm. He reported a diagnosis of only chronic cervical, thoracic and lumbar strain with no evidence of radiculopathy (Exhibit 15F)." (Tr. 17-18). Finally, the ALJ cites a record dated January 11, 2008, on which a nurse practitioner recorded no diagnosis of fibromyalgia despite Claimant requesting the diagnosis. (Tr. 18).

Second, the ALJ examines Claimant's allegations of disability due to migraine headaches with blurred vision. (Tr. 18). The ALJ cites a record dated February 15, 2006, reporting that an MRI of the brain, taken after Claimant complained of loss of vision in both eyes, was entirely normal (Exhibit 2F). (Tr. 18). Additionally, the ALJ notes that Claimant's primary care physician diagnosed migraine headaches on only one occasion, January 5, 2007 (Exhibit 19F). (Tr. 18).

Third, the ALJ examines Claimant's alleged disability due to numbness in her hands. (Tr. 18). The only medical record indicating any such problem signaled "a positive Tinel's sign at the left wrist suggesting possible carpal tunnel syndrome. The Tinel's sign was negative on the right (Exhibit 15F). (Tr. 18). The ALJ discredits this allegation because "the claimant testified that her right hand, not her left hand, was continuously numb." (Tr. 18).

Fourth, the ALJ notes "that the record contains reports of possible prescription drug abuse." (Tr. 18). The medical records of Claimant's primary care physician "contain several

reports of the claimant requesting refills of her medications after 'losing' them." (Tr. 18). The ALJ again cites multiple medical records beginning with a report dated January 17, 2006, in which "the physician reported that he had a 'major problem' with the claimant taking too many different kinds of medications whenever she thought she needed them;" a report dated June 29, 2006, in which "the physician reported a diagnosis of Xanax addiction;" a report dated January 2, 2007, in which "the physician reported that it had come to his attention that the claimant was getting prescriptions from multiple other providers and that there was some concern that the prescriptions had been falsified" and "reported that he would not prescribe Soma for the claimant in the future and would be very cautious about prescribing Xanax;" and finally a report dated January 5, 2007, in which the physician reported that "the claimant had 'gotten herself in trouble' with prescription abuse but denied all the charges that had been given to her" and that "claimant requested Xanax but the physician refused to prescribe it and stated that the claimant would be discharged from the practice if any prescription abuse directed toward his office was found (Exhibit 19F)." (Tr. 18). Additionally, the ALJ notes that Claimant required no hospitalizations or visits to specialists; numerous records indicate occasions during which Claimant failed to specify any particular complaint; and despite complaints of allegedly disabling symptoms, Claimant testified that she does not take any medications for pain and had not had any physical therapy. (Tr. 18-19).

Finally, the ALJ concluded that Claimant exaggerated the nature and extent of her symptoms based on Claimant's own testimony regarding her daily activities. The ALJ notes Claimant's daily activities and states that they "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 21).

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: doing laundry and ironing, bringing in wood for the woodstove, preparing meals, packing her husband's lunch, taking care of her dog, doing household chores, driving a vehicle, shopping for groceries, paying bills and handling money with assistance, taking care of her own personal needs, and watching the news. In addition the claimant testified that she was helping her sister and brother-in-law with a business venture. . . . [F]urther . . . the claimant has given inconsistent information in the areas of the 'B' criteria, as detailed at step three of this evaluation.

(Tr. 21).

The Court finds that the ALJ had more than a mere scintilla of evidence and appropriately discredited Claimant.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision to afford little weight to the opinions of two of the treating sources and to discredit Claimant's testimony as to the intensity, persistence, and limiting effects of the symptoms.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 5, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE